STEVEN G. KALAR
Federal Public Defender
Northern District of California
GRAHAM ARCHER
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:   (510) 637-3500
Facsimile:   (510) 637-3507
Email:       Graham_Archer@fd.org


Counsel for Defendant Cummings


IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION


| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MALCOLM CUMMINGS,<br><br>Defendant. | **Case No.:** CR 20–00002 HSG<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>**Court:**          Courtroom 2, 4th  Floor<br>**Hearing Date:**  March 3, 2021<br>**Hearing Time:**  1:00 p.m. |


## INTRODUCTION

Defendant Malcolm Cummings submits this sentencing memorandum to assist the Court in fashioning an appropriate sentence.  Mr. Cummings has accepted responsibility by waiving detention and indictment, and entered a guilty plea to the single charged count – Possession with intent to distribute 50 grams or more of a mixture or substance containing methamphetamine in violation of 21 U.S.C. 841(a)(1) and (b)(1)(B).  He is subject to a 60-month mandatory minimum sentence.

Mr. Cummings underwent extraordinary trauma as a child, suffering physical and sexual abuse, and severe neglect.  After his mother suffered a stroke that left her comatose when he was 13, Mr. Cummings was left to fend for himself on the streets of Oakland at age 13.  Mr. Cummings turned to

drugs – cocaine, methamphetamine and heroin – to cope with his trauma and abandonment, and turned to petty theft to feed himself and keep a roof over his head. Yet, at age 27, and in spite of these circumstances, this is Mr. Cummings's first felony conviction; his two prior non-violent misdemeanor convictions resulted in jail terms of 8 and 64 days.

Probation recommends a downward variance, and a 78-month sentence based on Mr. Cummings's "unstable upbringing, age, lack of parental guidance, limited education and drug addiction." *See* Presentence Report ("PSR") Sentencing Recommendation at 2. Mr. Cummings agrees that a downward variance is appropriate based on these factors. However, a further variance is appropriate to address the unsound Guideline disparity between "actual" and "mixture and substance" methamphetamine in light of the factual circumstances of this case.

Mr. Cummings asks, after taking into account all of the information and argument set forth below, that the Court impose a sentence of 60 months, to be followed by 4 years of supervised release.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Malcolm Cummings's Personal Background

Malcolm Cummings is the youngest of two children, along with his older brother Danny Cummings, Jr., born to Danny Cummings, Sr. and Jackie Tillman Cummings. Ms. Tillman also had five children, Martin, Jason, Shawn, Ivy, and Rachel, with a prior partner who were raised in the same household as Malcolm. To distinguish between the children, Mr. Cummings is referred to as Malcolm throughout this section. Malcolm's father, Danny Cummings Sr., was addicted to crack cocaine, and was described as a "functional crackhead," and abusive, during Malcolm's early childhood. *See* Declaration of Madeline Larsen ("Decl.") at 56, attached as Exhibit A. As his addiction worsened, he stopped helping with the bills, and Ms. Tillman Cummings divorced him. *Id.* While Mr. Cummings was in the house, he was physically abusive to the children, in particular to the older male step-children, but also to Danny and Malcolm, regularly beating them with a belt. *Id.*

Malcolm's sister Rachel described their mother as a caring and resourceful woman who made sure they had a hot dinner every night. They ate breakfast and lunch at school and dinner at home. *Id* at 43. As a single mother with seven kids, their mother struggled. Between 1999 and 2007, there

1   were four referrals to CPS regarding Malcolm's care, with allegations of neglect, lack of parental

2   supervision for days at a time, lack of food in the home, no attendance at school, and drug and

3   alcohol use by the supervising adults in the home.  None of those referrals resulted in any services

4   being provided to the family.  *Id* at 66.

5        While their mother did the best she could for them, the children grew up in violent

6   neighborhoods and saw "countless violence toward close friends."  *Id* at 5.  When Malcolm was

7   about six years old, he and Danny saw a close friend shot in the head in front of Mr. Cooper's store in

8   West Oakland.  Danny remembers he and Malcolm watching as their mother and their older brother

9   Jason were "scooping [their cousin's] brains up and putting them in his head," and saw them trying to

10  use a "belt to keep his head together," and seeing his mother covered in blood.  *Id*.  Danny shared that

11  their mother offered he and Malcolm unconditional love, and that she was their provider.  She made

12  sure that Malcolm got medical care and took his medication for his respiratory issues. *Id.*

13       During the summer when Malcolm was between 7th and 8th grades, his mother had a stroke.

14  Danny and Jason discovered their mother unresponsive and convulsing on the bathroom floor at her

15  boyfriend's house.  *Id.* at 46.  The stroke left her in a vegetative state from which she would never

16  recover.  She remained hospitalized in a coma until she passed away on April 24, 2017.  *Id* at 6.  Over

17  the years that followed, Malcolm would visit his mother "very often once she was hospitalized."  *Id*

18  at 28.  His sister Ivy recalled that Malcolm would sit at his mother's bedside and massage her feet

19  when he visited, and his uncle Daryl Passmore noted that Malcolm was the only person who seemed

20  to be able to could get a response from his mother.  *Id* at 40, 28.

21       After the stroke, the fragile ties keeping Malcolm's childhood together burst.  With their

22  mother in a comatose state, the family lost her Section 8 benefits, and they were evicted from their

23  apartment.  The children "got scattered and had to fend for [themselves]."  *Id* at 49.  Malcolm's

24  mother's relationships with abusive men had damaged her relationship with her family, and nobody

25  stepped forward to take care of Danny and Malcolm. *Id* at 49, 54.  A comment on a family Facebook

26  posting after their mother's death sums up the family's response to her coma – "the aunts and uncles

27  failed little Malcolm and little Danny because when Jackie fail sick they should have stepped up and

28  took they sick sister two babies in…… and they didn't – they let them go with a crack head – those

1   two are the only ones who was failed." *Id* at 64.  Malcolm's siblings Danny and Ivy agree that the

2   loss of their mother hit Malcolm the hardest, as he was the youngest and was especially close to her.

3   *Id* at 6, 36.

4          What followed Malcolm's mother's incapacitation was heartbreaking.  His brother Danny

5   believes that "[t]he family let the streets have [us]." *Id* at 9. His sister Rachel, when she was 19, was

6   able to use their mother's ID to forge paperwork to get Malcolm enrolled in school, and was able to

7   get a letter and utility bill from their mother's boyfriend to establish residency for the school district.

8   *Id*. at 51.  Outside of school, there was nothing resembling a stable childhood for Malcolm.  His

9   father's friend Darryl Passmore, who considers himself an uncle to Malcolm, shared that Malcolm

10  "stayed with everybody and anybody he could," including Mr. Passmore. *Id*. at 23.  Mr. Passmore

11  describes how miserable Malcolm was when he would not get any presents for Christmas.  One year,

12  Mr. Passmore gave Danny some money to buy Malcolm a present, but made Danny keep the source

13  of the money a secret so the other children would not find out.  Danny was overjoyed to finally get a

14  gift. *Id* at 27.  Danny describes he and his little brother shuffling between shelters, the apartments of

15  their father's various girlfriends, squatting in abandoned homes, and paying crackheads rent to sleep

16  on couches and be able to shower. *Id* at 9, 10.

17         Living on the streets in some of the worst parts of Oakland, Malcolm witnessed frequent

18  violence, and was shot in the leg for no reason while walking down the street in 2012.  Danny lists

19  friends and family who were killed while the brothers were living on the streets – Kevin Rogers in

20  2010, Duane Johnson, in 2016, and Joshua Weathersby in 2018. *Id* at 11.

21         Danny explains how he and his brother felt after their life went upside down: "It's a dark

22  energy, like an oppression.  A dark cloud over you.  You don't feel like success is around the corner.

23  Most people wake up thinking today is maybe the day [to succeed].  Growing up how we grew up –

24  going to sleep with a hungry stomach – waking up, we were just hoping we could make it." *Id* at 12.

25  Danny described he and his brother in their teens as "poor, hungry as fuck . . . they took scraps to get

26  by."

27          When Malcolm was placed on probation as a Juvenile, the dire neglect were apparent to his

28  Probation Officer.  She wrote on February 3, 2011, when he was 17, that Malcolm "has no parental

supervision. He is currently residing with a person whom he does not know their last name or the address. . . In a sense this minor is raising himself." She continued in June of 2011: "This minor has been dealt a difficult set of circumstances that are not his fault.  His father has essentially failed to take care of the minor and work with the probation department.  Malcolm appears to be living in various residences in Oakland." *Id* at 67-68.

Malcolm turned to drugs to cope.  At age 12, while looking for cigarettes in his father's car's glove compartment, he came across crack, which he took and used.  By 15, he was using marijuana, heroin, and cocaine daily.  He would mix heroin and cocaine to find a balance between the upper and downer.  PSR at 53.  That mixing of drugs continued; when Malcolm was arrested in this case, he was high on methamphetamine, and was opening a baggie of heroin in his lap on BART to prepare it for use. PSR at 11.  While he was referred to NA meetings in 2018 as part of his criminal case, he has never participated in either residential treatment, or an organized and concerted outpatient program.  He estimates that his addiction cost him as much as $50-100 a day at its peak.  PSR at 54.

Malcolm has had a series of jobs as an adult, from food service to construction.  Much of the proceeds of his employment have gone to support his drug problem, and his drug problem has made it difficult for him to maintain employment or develop a career.  He would like to learn a trade while in prison, carpentry or ironworking if they are available, so that he can join a union upon his release.

Malcolm's siblings describe him as a sweet and person with a good heart in need of direction.  Danny says that "[s]ome people are a light in dark times.  He's a light to us, to our family. For him to be away, things are a little bit dark right now." Decl. at 19. Daryl Passmore describes Malcolm as a good guy with a positive attitude.  *Id* at 30.  His sister Ivy describes Malcolm as a really sweet person who has made some bad decisions.  Rachel shared that when it comes to family, Malcolm would give you the shirt off his back.  He's funny, goofy, and has a great personality.  *Id* at 60.

**II.**         **Procedural Background and Offense Conduct**

While Mr. Cummings's guilty plea was delayed because of the COVID-19 pandemic that began shortly after his appearance on this case, he acknowledged his responsibility at the outset by waiving detention and indictment, and agreeing to proceed by information.

As Mr. Cummings describes in his statement to USPO Suntay, the offense conduct is not as it

immediately appears.  That the BART police officer who arrested him thought that Mr. Cummings was bagging up heroin on BART is understandable, but incorrect. PSR at 6.  He was, instead, opening a baggie of heroin in order to use some to temper the high of the methamphetamine he had taken earlier.  When undersigned counsel reviewed discovery with Mr. Cummings, he was able to identify in evidence photographs the baggie that he had chosen to open because it was the smallest one in the bunch. Mr. Cummings, at 9:30 a.m. in the morning, was heading away from San Francisco's Tenderloin at the end of a two-day meth and heroin bender fueled by money he had earned working in construction.  *Id* at 11.  Having run out of money and drugs, Mr. Cummings saw a Honduran drug dealer put a bag in the back of a car and go into a store.  Mr. Cummings broke into the car, grabbed the bag, and took off.  When he opened the bag, he realized he had hit a jackpot of sorts, at least for an addict who had run out of money and drugs – it contained heroin, meth, a phone, and the gun and ammo recovered when Mr. Cummings was arrested.  *Id*.  Mr. Cummings gave some of the baggies of drugs to other addicts in the neighborhood, took some himself, and then took BART back to Oakland after it opened.  After a stop in downtown Oakland to get food, Mr. Cummings re-boarded BART bound for East Oakland and was arrested after the BART officer saw him with baggies of drugs in his lap.  *Id*.

Mr. Cummings was charged in Alameda County on September 26, 2019, and was indicted and transferred to federal custody on November 25, 2019 after the state charges were dismissed.

## ARGUMENT

**I.   The tragic circumstances of Mr. Cummings's upbringing, and his struggles with substance abuse, warrant a sentence below the guideline range.**

After his mother's tragedy, Mr. Cummings was let down by family members who, in the words of his brother Danny "let the streets have [us]."  Mr. Cummings was further let down by the county's safety net, which received four separate CPS referrals, yet took no action to support the family.  As his juvenile probation officer noted, the system was well aware that Mr. Cummings had been responsible for raising himself for some time when he had contact with the juvenile justice system.

Mr. Cummings also did not come to start using drugs by accident.  He needed not look to the outside community, either.  Even before he found the rocks of crack in his father's car, Mr.

Cummings was exposed to his father when his father was on drugs, to the dismay of other family members. *Decl.* at 32. Mr. Cummings's heavy drug use negatively affected his decision-making in the days and hours leading up to the offense conduct.

Further, his decision-making process is significantly affected by the trauma, or "Adverse Childhood Experiences" (ACEs) that he experienced as a child. Adverse Childhood Experiences are linked to long-term changes in the brain that impact decision-making. *See, e.g.*, Anda, Felitti, et. al., *The enduring effects of abuse and related adverse experiences in childhood: A convergence of evidence from neurobiology and epidemiology*, Eur. Arch. Psychiatry Clin. Neurosci. 2006 April; 256(3) 174-186[1] (concluding that "the graded relationship of the ACE score to 18 different outcomes[2] in multiple domains theoretically parallels the cumulative exposure of the developing brain to the stress response with resulting impairment in multiple brain structures and functions."). An article in *The Atlantic* discussed this research:

> Unpredictable childhood trauma has long-lasting effects on the brain. Studies have shown that people with adverse childhood experiences are more likely to suffer from mental and physical health disorders, leading people to experience a chronic state of high stress reactivity. One study found that children exposed to ongoing stress released a hormone that actually shrank the size of the hippocampus, an area of the brain that processes memory, emotion, and stress management. Individuals who have experienced emotional or physical neglect by a parent are also at a greater risk of suffering from chronic illness as adults. "Chronic, unpredictable stress is toxic when there is no reliable adult," said Donna Jackson Nakazawa, the author of Childhood Disrupted and a science journalist who focuses on the intersection of neuroscience and immunology.

Cindy Lamonthe, *When Kids Have to Act Like Parents, It Affects Them for Life*, The Atlantic, October 26, 2017.[3] Mr. Cummings's childhood and teen years were marred by an unrelenting stream of Adverse Childhood Experiences – physical abuse, sexual abuse, household violence, household substance abuse, community violence, housing instability and homelessness, and poverty. As a result, he suffers from significant depression and anxiety. Mr. Cummings's actions, while serious, should be viewed through the lens of his upbringing. As his family attests, he is a kind and decent person who

---

[1] Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3232061/
[2] These 18 areas are subcategories of the following: mental disturbances, somatic disturbances, substance abuse, impaired memory of childhood, sexuality and perceived stress.
[3] Available at https://www.theatlantic.com/family/archive/2017/10/when-kids-have-to-parent-their-siblings-it-affects-them-for-life/543975/

fell into a dark place of drug abuse after personal tragedy and neglect.  In that light, a downward variance is warranted under Section 3553(a)(1).

**II.    Five years in prison is more than a sufficient incremental penalty for a non-violent first felony conviction in the circumstances Mr. Cummings presents to the Court**

Far more than prison, Mr. Cummings needs drug treatment, job training, and mental-health support.  While Mr. Cummings is subject to the 5-year mandatory minimum because the firearm he possessed bars him from Safety-Valve relief under 3553(f), he would otherwise have been an ideal candidate for the ATIP program.  He has been in jail now for 17 months, and is a far healthier and clearer-headed person than he was when he was arrested in September of 2019.  His brother Danny sees the change – he feels that Malcolm is doing a lot better, and has benefited by having the time to reflect on himself, and believes that Malcolm sounds much more mature than before. *Decl.* at 19.  Prior to this arrest, he spent 64 days in jail for his 2014 misdemeanor conviction, and 8 days in jail for his 2019 misdemeanor conviction.  Mr. Cummings has never been to prison.

Mr. Cummings wishes to participate in the RDAP program, and asks that the Court recommend that for him.  Unfortunately, because of the firearm possessed during the offense conduct, he is barred from the early release and aftercare awarded successful RDAP participants. *See* 28 C.F.R. 550.55(b)(5)(ii).  That means that no matter Mr. Cummings's commitment to his sobriety and recovery, he will be required to complete his entire sentence in prison, less good time credits.

In crafting a sentence, the Court may consider the need for incremental punishment.  Here, Mr. Cummings is suffering a felony conviction, with all of the debilitating collateral effects that carries, and is being sent to prison for at least 5 years.  As incremental punishment goes, five years is more than sufficient, and a lengthier sentence would be greater than necessary for a defendant in these circumstances.

**III.    Mr. Cummings's Criminal History Category over-represents the seriousness of his criminal history**

Mr. Cummings's criminal history reflects neglect, drug addiction, and little else.  There is no violence, no gang affiliation, and there are no weapons in his arrest or conviction history.  Yet Mr. Cummings's two misdemeanor convictions combined with unsupervised misdemeanor probation land him midway up the scale in Criminal History Category III.  Mr. Cummings asks that the Court depart

downward to Criminal History Category II under USSG § 4A1.3(b)(1), as Category III "substantially over-represents the seriousness of [his] criminal history as well as the likelihood that [he] will commit other crimes." In the alternative, Mr. Cummings asks that the Court consider the nature of his convictions in crafting a variance that takes into account the convictions underlying his criminal history score.

**IV.   Following the Guideline for "pure" methamphetamine would result in a sentence far greater than necessary given the circumstances of this offense**

The primary driver of the extraordinarily high guideline range in this case is the extreme treatment given to methamphetamine by the Sentencing Guidelines, and even more so the extraordinary penalties called for when the methamphetamine is tested, and purity percentage is assigned to "actual" methamphetamine. Unlike most other guidelines applicable to controlled substance offenses, the guidelines for methamphetamine offenses distinguish between two forms of the substance – actual and mixture. *See* USSG § 2D1.1(c). The base offense level is determined either by the actual methamphetamine contained within a mixture or by the weight of the entire mixture containing a detectable amount, whichever results in a higher base offense level. USSG § 2D1.1(c)(B).

As several district courts have concluded, there is no "empirical data from the Sentencing Commission or in the academic literature which would justify the ratio." *United States v. Boyd*, 437 F. Supp. 3d 830, 832 (D. Idaho 2020); *see also United States v. Hayes*, 948 F. Supp. 2d 1009 (N.D. Iowa 2013) (varying downward from 151-118 months to 75 months); *United States v. Carrillo*, 2020 WL 885582 (E.D. Cal. Feb. 24, 2020) (granting variance because purity is neither a proxy for, nor probative of, a defendant's role or position in distribution). "Rather, these distinctions seem to be tiered to a similar 10:1 ratio used in the mandatory minimum sentences imposed by Congress." *Id.* As these and other courts have recognized, neither the distinction between "actual" and "mixture" methamphetamine nor the stark disparity in their respective advisory ranges makes much sense.

First, the reliance on purity is based on an outdated and false assumption that "unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the

1    drugs." *Boyd*, 437 F. Supp. 3d at 832 (quoting USSG § 2D1.1 cmt. 9); *see also United States*

2    *Nawanna*, 321 F. Supp. 3d 943 (N.D. Iowa 2018) (finding that purity is an outdated proxy for relative

3    culpability); *United States v. Johnson*, 379 F. Supp. 3d 1213 (M.D. Ala. 2019) (rejecting the

4    methamphetamine guidelines' 10-to-1 ratio because it is "based on a flawed assumption that

5    methamphetamine purity is a proxy for role in the offense").

6         Here, as with nearly all cases in this District, the purity of the methamphetamine was high:

7    99%.  In fact, as this Court is aware, 99% pure methamphetamine is commonplace, particularly in

8    California, with its close proximity to industrial labs operated by drug cartels in Mexico.  Especially

9    on the West Coast, the purity of methamphetamine has continued to increase while the price has

10   plummeted.[4]  The DEA reported in 2018 that methamphetamine purity "remains at record highs" and

11   that the average purity in the last quarter of 2016 was 94.0%.  *See* DEA Intelligence Report at 3-4.

12   According to data compiled by the DEA, California is near the top of all states in terms of the purity

13   of available methamphetamine.  There is no evidence that Mr. Cummings had any knowledge of, let

14   alone control over, the purity of the methamphetamine that he stole.  Mr. Cummings was primarily

15   and end-user, and was certainly nowhere near the source of supply, having stolen "the stash" from a

16   street-level dealer.

17        Relying on methamphetamine purity guarantees that a defendant's base offense level will be

18   substantially higher in cases where the methamphetamine is tested for purity, even though whether or

19   not testing occurs in a given case appears to be arbitrary.  *See United States v. Ferguson* 2018 WL

20   3682509 (D. Minn. Aug. 2, 2018).  The methamphetamine may not be tested in a particular case

21   because the authorities seized only some of the drugs; because the labs are too busy to complete the

22   testing before sentencing; because the defendant pleads guilty to avoid purity testing; or because the

23   case originated with a state agency where testing could not be completed in a timely manner or

24   simply was not done.  This "potentially leads to a perverse game of beat the clock, whereby an

25   accused may try to plead guilty and get sentenced before lab results come back, so that his offense is

26   

27   [4] *See* DEA Intelligence Report (July 2018), https://news.umd.edu/sites/ndews.umd.edu/files/dea-
     2016-national-drug-price-purity-data.pdf; *see also* American Addiction Centers Editorial Staff, "Drug
28   Purities in America" (Aug. 1, 2019), available at https://lagunatreatment.com/addiction-
     research/drug-purities-in-america/.

1   treated as involving a methamphetamine mixture rather than actual/pure methamphetamine." *Id.* at

2   \*4.  "A lab technician's work speed should not determine the number of years a person spends behind

3   bars."  *Id.*  The testing in this case was done by the DEA's Western Lab on November 7, 2019, well

4   before Mr. Cummings was brought over to federal court on November 25, 2019.

5          In many cases in this District, defendants are permitted to resolve their cases prior to the testing

6   being done, and can avail themselves of the mixture and substance guideline.  There does not appear

7   to be any standardized policy for which defendants are offered the opportunity to resolve before

8   testing, and which are not.  Mr. Cummings was not.  He had no opportunity to try to "beat the clock"

9   for a lower advisory range.

10         The result is that identical offense conduct results in massively different guideline ranges,

11  based solely on the arbitrary decision of whether to forgo testing.  *See United States v. Rodriguez*,

12  382 F. Supp. 3d 892 (D. Alaska 2019).  In *Rodriguez,* Judge Timothy Burgess concluded that the

13  "current Guidelines methodology leads to [the] disparities and arbitrary differences" intended to be

14  avoided by 18 U.S.C. § 3553(a)(6).  The court further concluded that it would "routinely grant

15  downward variances to correct for the disparity that can result based solely on whether

16  methamphetamine was tested and the purity." *Id at 898.*

17         The fact that the drugs happened to have been tested in Mr. Cummings's case has nothing to do

18  with his culpability, the danger he may pose to society, or the nature and circumstances of the

19  offense, all factors that 18 U.S.C. § 3553 requires this Court to consider.  *Id.*  It reflects only the

20  nature and circumstances of the *investigation*, which is not a sentencing factor.

21         In this case, had the methamphetamine not been sent over for purity testing, Mr. Cummings's

22  base offense level would be 24 instead of 30.[5]  Given that, and given the lack of a sound basis for the

23  higher "actual" methamphetamine guideline discussed above, imposing a sentence under the higher

24  guideline would create an unwarranted disparity under Section 3553(a)(6).  Accounting for the 2-

25  level enhancement for the firearm and 3-level reduction for acceptance of responsibility, his Adjusted

26  Offense Level would be 23, and his advisory guideline range would be 57-71 months.  For the

27  ─────────────────

28  [5] Converted drug weight of 116.8kg for mixture and substance methamphetamine plus 21.09kg for
    heroin – 137.89kg combined weight results in offense level 24 (USSG § 2D1.1(c)(8)).

reasons set forth above, Mr. Cummings asks the Court to vary downward to that guideline range to prevent the disparity caused by arbitrary application of the "actual" methamphetamine guidelines.

## V.   Mr. Cummings's efforts at post-offense rehabilitation during COVID-19 warrant a variance

Mr. Cummings waived detention at the outset of the case, and has remained detained at the Santa Rita Jail since September 16, 2019.  During that time, most programming has been suspended, and he has been subject to regular lockdowns and quarantines.  In spite of that, Mr. Cummings has been able to work as a trustee and kitchen worker.  He has also been working toward his GED, taking classes in Math and English.  While he has not completed his GED program due to the frequent pandemic-related delays and quarantines, he intends to bring his most recent progress reports to sentencing for the Court's consideration.

## VI.   The Court should consider both the unusually severe conditions of pretrial detention, as well as the conditions in BOP over the next few years in fashioning a sentence

Mr. Cummings has now lived through 12 months of a pandemic at the Santa Rita Jail.  For the last several months, the facility has circulated through countless rounds of quarantines – each time the facility believed a unit was potentially exposed to a COVID-19 positive individual – whereby entire housing units are locked down, and inmates are not allowed to leave for clinic appointments, classes, or attorney visits.  Such quarantines have come often and without warning.  Since the outbreak, SRJ has suspended all family visits, as well as mental health and substance abuse programming.[6]

The BOP has also indefinitely suspended all family visits, access to classes and programming, and movement through their facilities, which translates into, diminished exercise time and longer periods of closed-space confinement.[7]  It also means the unavailability of rehabilitative programming that might have allowed inmates to earn additional time credits under the First Step Act. Incarceration at the BOP now entails extremely restrictive conditions of confinement, which are

---

[6] *see* https://www.alamedacountysheriff.org/admin_covid19.php.  Accordingly, one of the fundamental goals of incarceration—rehabilitation—cannot realistically be achieved.

[7] *See* https://www.bop.gov/coronavirus/covid19_status.jsp.

significantly harsher than the conditions contemplated by sentences calculated under the Sentencing Guidelines.  *See United States v. Frew*, 2020 WL 6440484, *1 (N.D. Cal. Oct. 27, 2020) (granting compassionate release based, in part, on "the fact that [the] conditions of confinement have been much harsher than anticipated at the time of sentencing due to the pandemic").  Mr. Cummings asks that the Court take both the conditions of incarceration that he has already endured, as well as those anticipated at the BOP into account when deciding on a "just punishment" under Section 3553(a)(2)(A).

**CONCLUSION**

Malcolm Cummings needs treatment, rehabilitation, and education.  He will receive some of that at the BOP, but he will also be locked away from society for at least the rest of his 20s.  Mr. Cummings is not a dangerous person.  He is loved by his family, and his family acknowledges that they failed him when he was a child.  Mr. Cummings asks that the Court consider all the facts and arguments set forth in the preceding pages and impose a sentence of 60 months, to be followed by a four-year term of supervised release.

Dated:      February 24, 2021                     Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender
Northern District of California

/S
GRAHAM ARCHER
Assistant Federal Public Defender